**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| BRENDA WILLIAMS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:11-CV-1803 NAB |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM AND ORDER**

This is an action under 42 U.S.C. § 405(g) for judicial review of the Commissioner of

Social Security's final decision denying Brenda Williams's ("Williams") application for benefits

under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq.* Williams alleges disability due

to nerve damage in her right leg and back, anxiety, and asthma. Williams filed a Brief in

Support of Plaintiff's Complaint. [Doc. 7] The Commissioner filed a Brief in Support of the

Answer. [Doc. 10]. The parties have consented to the jurisdiction of the undersigned United

States Magistrate Judge pursuant to 28 U.S.C. § 636(c)(1).

### I.     Procedural History

On January 8, 2010, Williams applied for a Period of Disability and Supplemental

Security Income, alleging an onset date of October 3, 2008. (Tr. 142.) Williams's claim was

denied on initial consideration on March 4, 2010. (Tr. 71-75.) Williams requested a hearing

before an administrative law judge ("ALJ") on April 16, 2010. (Tr. 78-79.) Following a hearing

before the ALJ, the ALJ issued a written opinion on April 29, 2011, upholding the denial of

benefits. (Tr. 10-22.) On August 22, 2011, the Appeals Council denied Williams's request for

review.  (Tr. 1-3.)  The ALJ's decision thus stands as the Commissioner's final decision. Williams then filed this appeal on October 18, 2011.  [Doc. 1].

## II.     ADMINISTRATIVE RECORD

### A.     Testimony Before the ALJ

On March 3, 2011, the ALJ held a hearing and heard testimony from Williams and a vocational expert.  (Tr. 23-68.)  Williams was represented by counsel.  (Tr. 25.)

#### 1.     Claimant's Testimony

Williams testified that she was 49 years old at the time of the hearing.  (Tr. 29.)  Williams stated she attended business school for two years after graduating from high school where she received training in computers and business accounting.  (Tr. 31.)  Williams claimed that none of the vocational training she received in business school was relevant today, furthermore, she would be unable to perform any vocation that she received training for in her present condition. (Tr. 31.)

Williams testified that she was injured in a fall as described by her attorney on October 3, 2008.[1]  (Tr. 28, 31.)  After the fall, Williams resumed working as a loan officer at Integrity Financial after her brace was removed in January 2009.  (Tr. 31-32.)  She testified that she worked from home generating new loans and returned to the office in March 2009.  (Tr. 32.) Williams stated that she processed one loan in those three months, earning about $700 in income. (Tr. 32.)

Williams stated that she had difficulty performing her job as she had before the accident. (Tr. 33.)  She testified that she could no longer keep up with the persistence and pace that the job required and had a hard time retaining information.  (Tr. 33.)  Williams stated she was in a

---

[1] Williams's attorney told the ALJ in his opening statement that Williams had a fall in October 2008, which involved Williams falling seven feet backwards off of a deck and landing on a deck rail, which gave way.  (Tr. 28.) He also stated that the fall caused a compression fracture in Williams's spine.  (Tr. 28.)

considerable amount of pain at that time.  (Tr. 33.)  Williams agreed to leave her job in March 2009 when her boss determined that she could no longer perform her duties as before.  (Tr. 34.)

Prior to her accident in October 2008, Williams testified that she had worked for 10 years in the loan industry.  (Tr. 34.)  She stated that she worked as a property manager for about fourteen years before becoming a loan originator and closer.  (Tr. 55-57.)  According to Williams, she was no longer able to perform this kind of work or any other type of office or real estate work.  (Tr. 34-35.)  Her previous employer is no longer in business.  (Tr. 35.)  Williams testified that she never received unemployment benefits, welfare, any other kind of charity or government aid (Tr. 40), or workman's compensation benefits.  (Tr. 53.)  Williams stated that she "never had to do anything like this before" and she was embarrassed.  (Tr. 40.)

Williams testified that she had constant pain in her back and right leg.  (Tr. 35.)  Williams also testified that there were no other jobs she could perform in her present medical condition.  (Tr. 46.)  She stated that she was told not to keep or put pressure on her back.  (Tr. 48.)  Williams stated that she could only stand about an hour or hour and a half total throughout a workday.  (Tr. 48.)  Williams reported being unable to do any bending or stooping.  (Tr. 49.)  She testified that she did not kneel and needed help to stand if she was low to the ground.  (Tr. 52-53.)  She also testified that her pain had gotten worse over the last year and caused her to walk less.  (Tr. 51.)  Williams stated that she was unable to perform a job that required sitting six hours a day because sitting was problematic for her.  (Tr. 52.)  In addition, she stated she was unable to do unlimited pushing or pulling with a 10-pound weight restriction.  (Tr. 52.)  Williams testified that her pain forced her to lie down during the day.  (Tr. 37-38.)  She also testified that she needed to elevate her right leg to control her pain, and that doing this up to twice a day helped minimize her need to take pain medications.  (Tr. 38.)  Williams also stated an average day for her

involved "moving positions, [doing] anything to alleviate [her] pain." (Tr. 44.) Williams also testified she suffered from memory loss that impacted her ability to perform her past job. (Tr. 40-41.)

Williams testified that she was currently taking Percocet, Xanax, and cholesterol medication. (Tr. 58.) Williams said that she took Percocet up to 6 times per day but would "do her hardest not to" take the full amount because it caused dizzy spells and concentration problems. (Tr. 36.) Williams stated that if she took 4 or 5 pills a day, the pain would prevent her from doing anything around the house. (Tr. 36.) She also testified that an increase in her activity necessitated an increase in her pain medication. (Tr. 36-37.) Williams stated that her pain and subsequent need to take pain medication was unpredictable (Tr. 41) and based on the pain she was experiencing (Tr. 42). She also said that the medications helped but that they caused confusion, dizzy spells, memory loss, affected her ability to drive (Tr. 58), read books (Tr. 42), and sometimes caused her to cancel planned trips. (Tr. 43.) Williams testified she suffered no physical side effects from her medication. (Tr. 58.) Williams assumed she would need to be on narcotic pain medication "forever." (Tr. 36.)

Williams testified that her pre-existing anxiety issues became "extremely" worse after her accident. (Tr. 39.) Her anxiety resulted in panic attacks, crying spells two to three times a week, and irritable moods. (Tr. 39-40.) Williams believed her limited mobility and unemployment caused her to become depressed and anxious, for which she sought treatment. (Tr. 39-40.)

Williams testified that she lived in a house with stairs. (Tr. 29.) Williams denied being able to frequently go up and down stairs (Tr. 52) and testified that she needed to limit what she carried. (Tr. 30.) She stated her husband or son carried larger baskets of laundry and groceries

up and down the steps.  (Tr. 30; 49.)  She also stated that she still used the stairs, such as when she washed her husband's "light laundry."  (Tr. 30.)

Williams stated that she tried to "help as much as possible" by dusting, emptying the dishwasher, cooking, doing the laundry, and sometimes caring for the family's pets.  (Tr. 45-46.) She also stated that she did not mow the lawn or take out the trash.  (Tr. 45.)  Williams testified that that she had no problems with bathing or hygiene except that leaning over to shave her legs hurt.  (Tr. 44-45.)  Williams testified that she drove two to three times a week, sometimes as far as an hour-and-a-half from her home.  (Tr. 42-43, 54.)  Williams testified that she had problems sleeping, she woke constantly, and was tired during the day.  (Tr. 47.)  Williams testified that she had taken Ambien to help her sleep but that it was ineffective.  (Tr. 47.)

### 2.      Vocational Expert's Testimony

Gary Wiemhold, a vocational expert ("VE"), testified at the hearing.  (Tr. 61-68.)  He testified that William's past relevant work fit the DOT definitions of a Mortgage Loan Interviewer and Closer, which are sedentary and skilled jobs at the second level of skill.  (Tr. 65.)  The VE considered William's previous jobs as a Property and Apartment House Manager to be light jobs that required some standing and walking and were on the first or second level of skill.  (Tr. 65-66.)

The ALJ posed the following hypothetical question to the VE:

> "Please assume a person of claimant's age, education, and work experience.  Please assume a person capable of performing at the sedentary exertional level as defined in the Social Security regulations, however please assume that that person is further limited and that they need to sit/stand option every 15 minutes with –while remaining at task, and are limited in that they can only perform some repetitive tasks.  Would such a person be able to perform any of the claimed past work?

(Tr. 66.)  The VE testified that such a person would be unable to perform Williams's past work because needing to sit/stand every fifteen minutes was not practical at most sitting/standing types of jobs and the requirement that it be simple work was inconsistent with the complexity of Williams's past work.  (Tr. 66.)  The VE further testified that there was no other work that such a person could perform in the regional or national economies.  (Tr. 66.)

## B.    Medical Records

On October 3, 2008, Williams was transported by ambulance to Jefferson Memorial Hospital after falling and injuring her back.  (Tr. 198.)  She complained of severe and constant neck, abdominal, right leg, and lower back pain.  (Tr. 198.)  CT scans showed two fractured ribs on Williams's right side and an L1 fracture on the lumbar spine.  (Tr. 201.)  The L1 fracture was a "mild wedge compression."  (Tr. 204.)  Dr. Robert Evans noted that Williams's pain was "controlled but…recurrent" with medication.  (Tr. 201.)

On October 4, 2008, Williams was transferred to St. John's Mercy Medical Center for additional treatment.   (Tr. 215-32.)   Her injuries included fracture, lumbar spine, L1, compression; right rib fracture; cerebral concussion; and anxiety disorder. (Tr. 215.)  Williams was prescribed a back brace. (Tr. 215.)  While hospitalized at St. John's Mercy, Williams was fitted for a TLSO[2] brace and received a "fairly substantial" dosage regimen of opioid analgesic[3]. (Tr. 215.)  She was discharged a few days later due to lack of space and suitability for discharge. (Tr. 215.)

On October 29, 2008, Williams visited Dr. Benjamin Albano.  (Tr. 252-53.)   He diagnosed Williams with closed fracture of four ribs, closed fracture of lumbar vertebra without

---

[2] TLSO is an acronym for Thoracolumbar Sacral Orthosis, which means a brace for the pelvic part of the thoracic and lumbar portions of the vertebral column.  Stedman's Medical Dictionary 1278, 1588, 1829 (27th ed. 2000).

[3] Opiod analgesic is an opiate or synthetic narcotic that relieves pain without loss of consciousness or producing anesthesia.  Stedman's Medical Dictionary 67, 1268-69 (27th ed. 2000).

spinal cord injury, and asthma. (Tr. 252.) Dr. Albano prescribed Oxycodone, Tylenol, Advair and continued William's Xanax and Proventil prescriptions. (Tr. 252.)

On December 4, 2008, Williams visited Dr. Lukasz Curylo (Tr. 288.) She complained of posterior right thigh pain that was aggravated by walking. (Tr. 288.) Dr. Curylo determined that Williams had "painless range of motion" and that she was "non-tender over the lumbar spine." (Tr. 288.) Dr. Curylo reported that "[s]he [was] off OxyContin" and that her L1 compression fracture was healed. (Tr. 288.) Dr. Curylo recommended Williams discontinue her back brace, prescribed Vicodin for pain, and set up physical therapy. (Tr. 288).

On December 9, 2008, Williams visited Lisa West, a physical therapist. (Tr. 238-39.) Williams reported she did not need to use a walker, and Ms. West noted she ambulated without a device. (Tr. 238.) Williams reported she had fallen 4-5 times due to her "right leg giving out" and that she had pain with crossing her right leg but felt it was getting stronger. (Tr. 238.) Williams stated she had difficulty sleeping, claiming her pain medication kept her awake. (Tr. 238.) Williams reported feeling significantly less pain when taking her medications. (Tr. 238.) Williams described having pain across the low back and L4 and up into her lower neck with intermittent tingling down the posterior thigh. (Tr. 238.) Ms. West noted that Williams had severe weakness in her abdominals and back, poor endurance, limited lumbar flexibility, radicular pain, and some tenderness through the hip joint. (Tr. 239.) The physical therapy treatment plan for Williams included physical therapy visits 2-3 times per week for progressive range of motion, stabilization, cardiovascular conditioning, modality support as needed for pain control, and a home program. (Tr. 239.)

On December 23, 2008, Williams saw Dr. Thomas Lieb. (Tr. 285-87.) Williams complained of discomfort in her back and pain in her right knee. (Tr. 285.) With ten being the

worst pain, Williams reported her pain to be 8 out of 10 at its worst and 2 out of 10 at its best. (Tr. 285.) Williams stated that sitting, straining, walking, and lying down were aggravating activities but that heat and medications were providing relief. (Tr. 285.) Dr. Lieb noted a past history of anxiety and depression. (Tr. 285.) Williams reported being independent with self-care and household activities but occasionally needed some assistance. (Tr. 286.) Dr. Lieb noted Williams drove and did not use a device for ambulation. (Tr. 286.) Dr. Lieb determined that Williams had mild tenderness in her back, non-tenderness over the L1 rib, no focal weakness in the muscles of her lower extremities, and full and nontender range of hip motion. (Tr. 286.) While Williams complained of pain in her right leg, Dr. Lieb's examination of her right knee showed no tenderness and the full range of motion. (Tr. 287.) Dr. Lieb diagnosed Williams with low back pain and right leg pain of an unclear etiology. He prescribed Percocet for chronic pain management. (Tr. 287.)

Williams attended physical therapy thirteen times between December 9, 2008 and February 10, 2009. (Tr. 233-237.) At her February 10, 2009 physical therapy appointment, Williams reported doing better overall, although she reported an increase in pain on that date. (Tr. 233.) Williams also reported that her pain was 1 out of 10 with two pain pills but 7 out of 10 prior to taking the medication. (Tr. 233.) Williams described feeling pins and needles in her arms and legs at night. (Tr. 233.) Ms. West found that Williams had "progressed greatly" in her ability to move without pain. (Tr. 233.) Ms. West determined that Williams's flexion was at 100%, extension at 75-100%, and side bending (left and right) at 100%. (Tr. 233.) Ms. West concluded that the goals of the physical therapy had been moderately to maximally met. (Tr. 233.) Ms. West recommended discharge from physical therapy and that Williams complete a strengthening/stabilization and walking program to control her back pain at home. (Tr. 233.)

On February 11, 2009, Williams visited Dr. Lieb. (Tr. 283-84.) Williams reported being frustrated by her persistent back discomfort, which was primarily in the mid to upper lumbar region. (Tr. 283.) Nonetheless, Williams had returned to her job and reported the pain, though aggravating, was not directly inhibiting her work. (Tr. 283.) She reported her pain to be 4 out of 10 at worst and 0 out of 10 at best. She reported taking 2-4 Percocet a day. (Tr. 283.) Dr. Lieb determined that her persistent low level discomfort likely emanated from her spinal injury but that it would hopefully "continue to improve over time." (Tr. 283.)

On April 15, 2009, Williams visited Dr. Lieb. (Tr. 279.) Williams complained of feeling "quite frustrated" by her persistent pain because it limited her general physical activity. (Tr. 279.) Williams reported her pain as being 6 to 7 out of 10 at worst and 2 out of 10 at best. (Tr. 279.) She identified her source of her pain in her lower back rather than in the upper lumbar region where the compression fracture occurred. (Tr. 279.) Williams reported increasing her dosage of Percocet to between 4 to 6 pills per day. (Tr. 279.) Dr. Lieb diagnosed Williams with chronic low back pain and ordered an MRI reimage of her back. (Tr. 279.)

On July 24, 2009, Williams saw Dr. Albano. (Tr. 258-59.) Williams reported having moderate to severe low back pain and radiating pain in her right leg. (Tr. 258.) Dr. Albano's examination revealed normal curvature of the spine, no vertical spine tenderness, no paraspinal spasm, no tenderness on SI joints, and straight leg raise testing was negative bilaterally. (Tr. 258.) He also found her motor system, sensation, and gait were normal and her reflexes were symmetrical bilaterally. (Tr. 258). Dr. Albano diagnosed closed fracture of lumbar vertebra without spinal cord injury, chronic bronchitis, and tobacco use disorder. He continued her medications and prescribed Singulair. (Tr. 258.)

On July 28, 2009, Williams visited Dr. Lieb. (Tr. 272.) Williams reported that things were "stable," she had no adverse reactions to medications, and her activity level was good. (Tr. 272.) Williams stated that her pain was 1 out of 10 at best and 7 out of 10 at worst but that her current medication was adequate. (Tr. 258.) She reported taking about three pills per day. (Tr. 272.) Dr. Lieb diagnosed Williams with chronic low back pain. (Tr. 272.) On September 15, 2009, Dr. Lieb noted in Williams' chart that she was taking up to six Percocet a day rather than three a day. (Tr. 270.) Dr. Lieb increased her monthly prescription accordingly. (Tr. 270.)

On October 27, 2009, Williams visited Dr. Lieb. (Tr. 269.) Williams said her analgesia[4] was fair, her activity level stable, and that she had no adverse reactions to medications. (Tr. 269.) Dr. Lieb diagnosed Williams with persistent low back pain and continued her Percocet prescription. (Tr. 269.)

On November 24, 2009, Williams visited Dr. Albano. (Tr. 261-62.) Williams complained of severe joint and back pain, morning stiffness, inability to stand more than one hour, inability to bend or lift more than ten pounds without pain, and drowsiness from her pain medications. (Tr. 261.) Williams also complained of being highly stressed due to her health, work, family, and financial troubles, depressed and sad moods, sleep disturbances, feeling overwhelmed, and crying easily. (Tr. 261.) Williams reported that she could not work since her accident due to pain and confusion from her medications. (Tr. 261.) Dr. Albano found Williams had restricted rotation on both sides of the cervical spine and restricted forward bending, restricted bending on both sides of the lumbar spine and restricted forward bending, sacroiliac joint tenderness on the left side, and restricted motion in all directions in the upper extremities.

---

[4] Analgesia is a "neurologic or pharmacologic state in which painful stimuli are so moderated that, though still perceived, they are no longer painful." Stedman's Medical Dictionary 67 (27th ed. 2000).

(Tr. 261.)  His diagnosis included closed fracture of lumbar spine without spinal cord injury, closed fracture of four ribs, and polyneuropathy.[5]  (Tr. 262.)

On November 25, 2009, Dr. Albano authored a letter regarding Williams.  (Tr. 265.)  Dr. Albano recommended disability due to pain stemming from her back injury (Tr. 265.)  Dr. Albano stated that Williams reported that her pain was severe and that she could not sit or stand for more than one hour.  (Tr. 265.)  He also stated that she reported that she could not lift or bend over due to pain and that the pain medications she took were sedating and "cloud[ed] her mind." (Tr. 265.)  The letter also stated that Williams reported that she could not perform basic paperwork at her company due to the pain and medications.  (Tr. 265.)

On January 26, 2010, Williams visited Dr. Lieb.  (Tr. 266.)  She reported her overall analgesia as fair.  (Tr. 266.)  Williams complained of confusion and drowsiness as "significant adverse" effects related to her Percocet use and took less medication to minimize these symptoms.  (Tr. 266.)  Williams reported that she was trying to remain active but was not "as active as she would like."  (Tr. 266.)  Dr. Lieb told Williams she should not be driving if she was having side effects from her medication and changed her medication to Hydrocodone and discontinued the Percocet.  (Tr. 266.)

On February 16, 2010, Williams' residual functional capacity ("RFC") was assessed by Dr. Jean Diemer, the state agency medical doctor.  (Tr. 293-98.)  Dr. Diemer found Williams could lift up to ten pounds frequently, stand and walk for a total of two hours in an 8-hour workday, sit for a total of six hours in an 8-hour workday, and had unlimited pushing and pulling.  (Tr. 294.)  Dr. Diemer's report states that the medical records show Williams progressed greatly in her ability to perform exercises and strengthening without guarding or pain,

---

[5]  Polyneuropathy is a non-traumatic generalized disorder of peripheral nerves.  Stedman's Medical Dictionary 1422 (27th ed. 2000).

was taking significantly less pain medication, and had improved lumbar flexibility and cord strength though pain remained centralized across her low back. (Tr. 294-95.) Dr. Diemer noted that Williams complained of an inability to stand or sit more than one hour, difficulty sleeping and bending, and becoming easily confused due to her medications, and depression. (Tr. 295.) Dr. Diemer also noted that Williams reported being able to prepare sandwiches and soups, do light housework, walk about one block daily, and drive short distances. (Tr. 295.) Dr. Diemer found her complaints only partially credible because she did not believe there was support for the complaints in the objective medical record. (Tr. 295.) Dr. Diemer concluded that Williams did not meet or equal a listed impairment that warranted a medical vocation allowance. (Tr. 295.)

On February 23, 2010, Williams visited Dr. Lieb. (Tr. 320.) Williams reported Hydrocodone interfered with her breathing. (Tr. 320.) Dr. Lieb changed the medication from Hydrocodone to Percocet. (Tr. 320.)

On March 4, 2010, Dr. Geoffrey Sutton, a psychologist, conducted a Psychiatric Review Technique regarding Williams. (Tr. 299-310.) He diagnosed Williams with an anxiety-related disorder. (Tr. 299.) Dr. Sutton found Williams had mild restrictions in the activities of daily living and social functioning as well as moderate difficulties in maintaining concentration, persistence, and pace. (Tr. 307.) Dr. Sutton noted that, while Williams had a diagnosis of anxiety disorder, she never received formal psychiatric treatment for these symptoms nor were overt psychological symptoms recorded in the treatment notes. (Tr. 309.) He determined that her allegations were mostly credible because her impairment was "more than not severe" and there was a reasonable probability that some limitations in concentration, persistence, and pace related to medication and/or pain existed. (Tr. 309.) Dr. Sutton found no evidence of impaired

intelligence or memory and believed Williams retained the ability to perform simple repetitive tasks on a regular basis. (Tr. 309.)

On March 23, 2010, Williams visited Dr. Lieb. (Tr. 318-19.) Williams reported that she was doing "terrible" and remained frustrated with her pain. (Tr. 318.) She reported being out of pain medication before the appropriate time, and Dr. Lieb emphasized that she needed to stay within the prescribed guidelines. (Tr. 318.) Williams reported her analgesia to be fair to poor, her activity level as marginal, and her sleep as very poor. (Tr. 318.) She denied having adverse reactions to medications. (Tr. 318.) Dr. Lieb increased Williams' Oxycodone prescription but limited her to six per day. (Tr. 318.)

On June 1, 2010, Williams saw Dr. Albano. (Tr. 332-33.) Williams complained of low back pain in the midline. (Tr. 332.) Dr. Albano's examination revealed normal curvature of the spine, no vertical spine tenderness, no paraspinal spasm, no tenderness on SI joints, and straight leg raise testing was negative bilaterally. (Tr. 332.) He also found her motor system, sensation, and gait were normal and her reflexes were symmetrical bilaterally. (Tr. 332). Dr. Albano diagnosed Williams with anxiety state, unspecified and closed fracture of the lumbar vertebra without spinal cord injury, and asthma. (Tr. 333.) He continued her Xanax and Percocet prescriptions. (Tr. 333.)

On June 22, 2010, Williams visited Dr. Lieb. (Tr. 317.) She reported her analgesia as fair to good and that her activity level was stable with some issues from dizziness. (Tr. 317.) Williams felt that was she doing "75% better" due to the change in pain medication and was sleeping better. (Tr. 317.) She reported her pain being seven out of ten at worst and 0 out of 10 at best. (Tr. 317.) Dr. Lieb continued the Oxycodone prescription. (Tr. 317.)

On September 15, 2010, Williams saw Dr. Lieb. (Tr. 316.) Williams reported having no ill effects from her medications and that her analgesia was "okay." (Tr. 316.) She stated that her pain was 3 out of 10 at worst and 0 out of 10 at best and that her sleep was stable. (Tr. 316.)

On December 10, 2010, Williams visited Dr. Lieb. (Tr. 315.) She complained of stress at home that led to increased activity and aggravation of her condition. (Tr. 315.) Williams reported she was "generally doing okay" and sleeping fairly, with her pain at 7 out of 10 at worst and 0 out of 10 at best. (Tr. 315.) Dr. Lieb continued to prescribe Oxycodone. (Tr. 315.)

On January 19, 2011, Williams visited Dr. Lieb. (Tr. 314.) Williams reported doing better since her last visit since stressors at home had decreased somewhat. (Tr. 314.) She said her analgesia was "okay," her activity level was stable, and she had no adverse reactions to medication. (Tr. 314.) Dr. Lieb diagnosed Williams with persistent back pain. (Tr. 314.)

On February 28, 2011, Williams visited Dr. Paul H. Wang, a psychologist. (Tr. 338.) Dr. Wang observed that Williams had a restricted affect and her mood was anxious, depressed, and frustrated. (Tr. 338.) Williams complained of lots of pain and expressed a desire to go back to the life she had. (Tr. 338)

Williams visited Dr. Wang on March 7, 2011. (Tr. 339.) Dr. Wang observed blunted affect and anxious and depressed mood in Williams. (Tr. 339.) He noted Williams was tearful and had "a lot of depression and anxiety." (Tr. 339.) Williams complained of pain and frustration at her inability to return to work and do what she used to do. (Tr. 339)

On March 21, 2011, Williams visited Dr. Wang. (Tr. 337.) Dr. Wang observed restricted and blunted affect and depressed mood. (Tr. 337.) Williams complained of being tired all day. (Tr. 337.) They discussed Williams's inability to resume life as before. (Tr. 337)

On April 6, 2011, Dr. Wang authored a letter regarding Williams. (Tr. 342.) Dr. Wang noted she had been diagnosed with major depression and panic disorder without agoraphobia. (Tr. 342.) He opined that Williams could not resume her prior employment or perform any work that required mental alertness and concentration. (Tr. 342.) He noted Williams had problems with short-term memory, focus, and concentration as well as chronic back pain that made standing or sitting for any extended period difficult. (Tr. 342.) Dr. Wang recommended Williams be considered for total disability given her physical, mental, and psychological limitations. (Tr. 342.)

### III.    ALJ DECISION

The ALJ found that Williams met the insured status requirements of the Social Security Act through March 31, 2011. (Tr. 15.) Next, the ALJ found Williams did not engage in substantial gainful employment after her alleged disability onset date of October 3, 2008 through her date last insured of March 31, 2011. (Tr. 15.) The ALJ determined that Williams suffered from the severe impairment of a residual of mild wedge compression fracture at L1 and the non-severe impairments of anxiety and asthma. (Tr. 15.) The ALJ also determined that Williams did not have an impairment or a combination of impairments that met or medically equaled a listed impairment in 20 CFR § 404.1520(d), 404.1525 and 404.1526. (Tr. 15.) Then, the ALJ found that Williams had the RFC to perform sedentary work with a sit and stand option every hour. (Tr. 16-21.) The ALJ found that based on the RFC, Williams could perform her past relevant work as a mortgage loan interviewer and closer. (Tr. 21-22.) Consequently, the ALJ concluded that Williams was not disabled within the meaning of the Social Security Act. (Tr. 22.)

## IV.    LEGAL STANDARD

Under the Social Security Act, the Commissioner has established a five-step process for determining whether a person is disabled. 20 C.F.R. §§ 416.920, 404.1529. "'If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled.'" *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (quoting *Eichelberger v. Barnhart*, 390 F.3d 584, 590-91 (8th Cir. 2004)).  In this sequential analysis, the claimant first cannot be engaged in "substantial gainful activity" to qualify for disability benefits. 20 C.F.R. §§ 416.920(b), 404.1520(b).  Second, the claimant must have a severe impairment.  20 C.F.R. §§ 416.920(c), 404.1520(c).  The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities … ." *Id.*  "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on [his or] her ability to work." *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting *Caviness v. Massanari*, 250 F.3d 603, 605 (8th Cir. 2001).

Third, the ALJ must determine whether the claimant has an impairment which meets or equals one of the impairments listed in the Regulations. 20 C.F.R. §§ 416.920(d), 404.1520(d); Part 404, Subpart P, Appendix 1.  If the claimant has one of, or the medical equivalent of, these impairments, then the claimant is per se disabled without consideration of the claimant's age, education, or work history.  *Id.*

Fourth, the impairment must prevent claimant from doing past relevant work.[6] 20 C.F.R. §§ 416.920(e), 404.1520(e). At this step, the burden rests with the claimant to establish his or her Residual Functional Capacity ("RFC"). *Steed v. Astrue*, 524 F.3d 872, 874 n.3 (8th Cir. 2008). *See also Eichelberger*, 390 F.3d at 590-91; *Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir. 2004). RFC is defined as what the claimant can do despite his or her limitations, 20 C.F.R. § 404.1545(a), and includes an assessment of physical abilities and mental impairments. 20 C.F.R. § 404.1545(b)-(e). The ALJ will review a claimant's RFC and the physical and mental demands of the work the claimant has done in the past. 20 C.F.R. § 404.1520(f). If it is found that the claimant can still perform past relevant work, the claimant will not be found to be disabled. *Id.*; 20 C.F.R. § 416.920(a)(4)(iv). If the claimant cannot perform past relevant work, the analysis proceeds to Step V.

At the fifth and last step, the ALJ considers the claimant's RFC, age, education, and work experience to see if the claimant can make an adjustment to other work. 20 C.F.R. § 416.920(a)(4)(v). If it is found that the claimant cannot make an adjustment to other work, the claimant will be found to be disabled. *Id. See also* 20 C.F.R. § 416.920(g). At this step, the Commissioner bears the burden to "prove, first that the claimant retains the RFC to perform other kinds of work, and, second that other work exists in substantial numbers in the national economy that the claimant is able to perform." *Goff*, 421 F.3d at 790; *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000). The Commissioner must prove this by substantial evidence. *Warner v. Heckler*, 722 F.2d 428, 431 (8th Cir. 1983).

---

[6] "Past relevant work is work that [the claimant] has done within the past 15 years, that was substantial gainful activity, and that lasted long enough for [the claimant] to learn how to do it." *Mueller v. Astrue*, 561 F.3d 837, 841 (8th Cir. 2009) (citing 20 C.F.R. § 404.1560(b)(1)).

If the claimant satisfies all of the criteria of the five-step sequential evaluation process, the ALJ will find the claimant to be disabled. "The ultimate burden of persuasion to prove disability, however, remains with the claimant." *Id.* *See also Harris v. Barnhart*, 356 F.3d 926, 931 n.2 (8th Cir. 2004) (citing 68 Fed. Reg. 51153, 51155 (Aug. 26, 2003)).

This court reviews the decision of the ALJ to determine whether the decision is supported by "substantial evidence" in the record as a whole. *See Smith v. Shalala*, 31 F.3d 715, 717 (8th Cir. 1994). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002). *See also Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007). Therefore, even if a court finds that there is a preponderance of the evidence against the ALJ's decision, the ALJ's decision must be affirmed if it is supported by substantial evidence. *Clark v. Heckler*, 733 F.2d 65, 68 (8th Cir. 1984). In *Bland v. Bowen*, 861 F.2d 533, 535 (8th Cir. 1988), the Eighth Circuit Court of Appeals held:

> [t]he concept of substantial evidence is something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the Secretary may decide to grant or deny benefits without being subject to reversal on appeal.

As such, "[the reviewing court] may not reverse merely because substantial evidence exists for the opposite decision." *Lacroix v. Barnhart*, 465 F.3d 881, 885 (8th Cir. 2006) (quoting *Johnson v. Chater*, 87 F.3d 1015, 1017 (8th Cir. 1996)). Similarly, the ALJ decision may not be reversed because the reviewing court would have decided the case differently. *Krogmeier*, 294 F.3d at 1022.

## V.    DISCUSSION

Williams alleges three points of error.  First, Williams asserts that the ALJ failed to provide the weight given to the medical opinions of Drs. Albano and Diemer and erroneously gave nominal weight to the opinions of Drs. Wang and Sutton.  Second, Williams contends that the ALJ failed to properly consider her anxiety as a severe medically determinable impairment.  Third, Williams states that the ALJ's determination that she could return to her past relevant work was not supported by substantial evidence.

### A.    Opinion Evidence

#### 1.    Treating Physicians

Williams first asserts that the ALJ failed to disclose the weight given to Dr. Albano's opinion and failed to give at least significant if not controlling weight to the opinions of Drs. Albano and Wang, Williams's treating physicians.  The Commissioner responds that the ALJ gave the appropriate weight to the opinions of Drs. Albano and Wang.

Generally, a treating physician's opinion is given controlling weight, but is not inherently entitled to it.  *Hacker v. Barnhart*, 459 F.3d 934, 937 (8th Cir. 2006).  A treating physician's opinion "does not automatically control or obviate the need to evaluate the record as a whole." *Leckenby v. Astrue*, 487 F.3d 626, 632 (8th Cir. 2007).  A treating physician's opinion will be given controlling weight if the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record.  20 C.F.R. § 404.1527(c)(2)[7]; SSR 96-2p; *see also Hacker*, 459 F.3d at 937.  When given controlling weight, the ALJ defers to a treating physician's medical opinions about the nature and severity of an applicant's impairments, including symptoms, diagnosis and prognosis,

---

[7] At the time of the ALJ's decision, this regulation was codified at 20 C.F.R. § 404.1527(d)(2).

what an applicant is capable of doing despite the impairment, and the resulting restrictions. 20 C.F.R. § 404.1527(a)(2); *Ellis v. Barnhart*, 392 F.3d 988, 995 (8th Cir. 2005). "A medical source opinion that an applicant is 'disabled' or 'unable to work,' however, involves an issue reserved for the Commissioner and therefore is not the type of 'medical opinion' to which the Commissioner gives controlling weight." *Ellis*, 392 F.3d at 994; *see also* 20 C.F.R. § 404.1527(e). Whether the ALJ grants a treating physician's opinion substantial or little weight, the regulations provide that the ALJ must 'always give good reasons' for the particular weight given to a treating physician's evaluation." (20 C.F.R § 404.1527(c)(2)[8]; *see Davidson v. Astrue*, 501 F.3d 987, 990 (8th Cir. 2007) (when an ALJ discounts a treating physician's opinion, he should give 'good reasons' for doing so); *see also* SSR 96-2p.

### a.    Dr. Albano

Williams contends that the ALJ erred by failing to provide the weight she gave to Dr. Albano's medical opinion, which Williams asserts should be controlling. Unless a treating physician's opinion is given controlling weight, the ALJ must explain the weight given to any medical opinion, whether it comes from a treating physician or a State agent. *See* 20 CFR §§ 404.1527(e)(2)(ii).

The ALJ's decision clearly states that "little weight is accorded to the findings and recommendations within Dr. Albano's November 25, 2009 letter." (Tr. 19.) The ALJ listed several reasons for attributing little weight to Dr. Albano's opinion. The ALJ noted the following: (1) the letter's recommendations and limitations appear to be almost exclusively based on Williams's subjective complaints and self-report; (2) recommendations and findings of limitation are grossly inconsistent with his own treatment notes; (3) recommendation and findings are unsupported by overall lack of supportive diagnostic testing; (4) pain statements are

---

[8]At the time of the ALJ's decision, this regulation was codified at 20 C.F.R. § 404.1527(d)(2).

unsupported by treatment; (5) statements regarding medication side effects are unsupported by treatment notes; and (6) the medical records do not document any physician's findings that Williams has had persistent and adverse side effects due to prescribed medication, which were incapable of being controlled by medication adjustments or changes. (Tr. 19.) Williams states that Dr. Albano's opinion is supported by "CT's (Tr. 204, 206) an MRI (Tr. 227-8), and signs and symptoms."

The Court believes that the ALJ's determination that Dr. Albano's opinion was entitled to little weight was permissible. Dr. Albano's letter states that Williams "report[ed]" severe pain and that she could not sit or stand for more than one hour. (Tr. 265.) Dr. Albano also states that Williams said she could not lift or bend over, that the pain medication she took was sedating and "cloud[ed] her mind," and that she could not perform basic paper work at her company due to the pain and medications. (Tr. 265.) The entire opinion consists of Dr. Albano's statement "recommending disability" and William's complaints. (Tr. 265.) Dr. Albano's letter is conclusory and does not cite to any objective medical evidence as the basis for his opinion. Therefore, the ALJ properly discredited Dr. Albano's opinion because it was based solely on Williams's subjective complaints without any supporting medical evidence.[9] *See Wildman v. Astrue*, 596 F.3d 959, 967 (8th Cir. 2010) (ALJ did not err when physicians' opinions were discounted because they were based largely on claimant's subjective complaints). The evidence cited by Williams as supporting Dr. Albano's opinion does not provide sufficient evidence for a finding of disability. The CT scans and MRI were taken at the time of Plaintiff's initial injury in October 2008 documenting that she had a mild wedge compression at L1 (Tr. 204, 206, 227-28) and it is unclear what Williams means by "signs and symptoms."

---

[9] Dr. Albano's November 24, 2009 treatment notes also indicate that his finding of disability was based solely on Williams's subjective complaints on that date. In those notes, he states "patient cannot function in her job due to pain and pain meds affect her concentration; so will recommend disability." (Tr. 262).

Further, as stated by the ALJ, Dr. Albano's letter contradicts his own treatment notes and the notes of Williams's other treating physicians. For example, X-rays taken by Dr. Curylo in December 2008 showed a healed L1 compression fracture, and a physical examination showed a "painless" range of motion with no tenderness over the lumbar spine or right knee. (Tr. 288). Similarly, Dr. Lieb in December 2008 found Williams had non-tenderness over the L1 rib, no focal weakness in the muscles of her lower extremities, and full and nontender range of hip and right knee motion. (Tr. 286-87.) Lisa West, Williams' physical therapist, in February 2009 found Williams had "progressed greatly" in her ability to move without pain, had little to no restrictions on the range of motion, and concluded the goals of physical therapy had been "moderately to maximally met." (Tr. 233.) Dr. Albano's examination in July 24, 2009 revealed normal curvature of the spine, no vertical spine tenderness, no paraspinal spasm, no tenderness on SI joints, normal straight leg raise, normal reflexes, normal sensation, and normal gait. (Tr. 258). Dr. Albano's November 24, 2009 examination found Williams had restricted rotation on both sides of the cervical spine and restricted forward bending, restricted bending on both sides of the lumbar spine and restricted forward bending, sacroiliac joint tenderness on the left side, normal range of motion of all joints in the lower extremity, and restricted motion in all directions in the upper extremity. (Tr. 261.) Dr. Albano did not change Williams's medication or treatment and scheduled her for a follow-up visit in six months. (Tr. 261). Dr. Albano's June 2010 examination, however, revealed normal curvature of the spine, no vertical spine tenderness, no paraspinal spasm, no tenderness on SI joints, normal straight leg raise, normal reflexes, normal sensation, and normal gait. (Tr. 332.) There are several notations in the medical record where Williams reported that her medication was adequate or had no adverse effects (Tr. 272,

314, 317, 318) and when she did complain about the side effects of her medication, it was changed or adjusted (Tr. 266, 270, 320).

Williams argues that if the ALJ questioned the credibility of Dr. Albano's opinions, she had a duty to re-contact him to clarify his opinions and motives. While an ALJ "has an independent duty to develop the record" fully and fairly, the ALJ is not required to re-contact a treating physician "unless a crucial issue is undeveloped." *Goff v. Barnhart*, 421 F.3d 785, 791 (8th Cir. 2005). Although an ALJ should re-contact a treating physician "when the information [he or she] provides is inadequate for the ALJ to determine whether the applicant is actually disabled," the regulations "do not require an ALJ to [re-contact] a treating physician whose opinion is inherently contradictory or unreliable." *Hacker v. Barnhart*, 459 F.3d at 938 (citing 20 C.F.R. § 404.1512(e)). In *Hacker*, the issue was not whether the treating physicians' opinions were somehow incomplete; rather, the ALJ found them unsupported by the record and the treating physicians' own earlier opinions and advice. *Id*. The court concluded the ALJ was under no obligation to re-contact the treating physicians under such circumstances. *Id*. Similarly, here, the ALJ gave little weight to the treating physician's opinion because she found his treatment notes and the objective medical record inconsistent with a finding of disability, not that his opinions were somehow incomplete. Therefore, as in *Hacker*, the ALJ was under no duty to re-contact Dr. Albano in this case. The ALJ did not err in according little weight to Dr. Albano's opinion.

### b. Dr. Wang's Opinion

The ALJ noted that Williams received treatment from Dr. Wang in February and March 2011. Dr. Wang's opinion letter dated April 6, 2011 states that in his opinion, given her physical, mental, and psychological limitations, he recommends that Williams be considered for total disability. (Tr. 342.) The opinion letter further states that Williams has problems with short term memory, difficulty with focus and concentration, chronic physical pain, difficulties with sitting or standing for an extended period of time. (Tr. 342.) The ALJ gave "little" weight to Dr. Wang's findings. (Tr. 21.) The ALJ states that the following facts undermine the weight accorded to Dr. Wang's opinion: (1) Dr. Wang's treatment notes do not reflect objective medical findings indicative of disabling limitations of function; (2) the medical treatment records fail to document mental health treatment prior to February 2011; and (3) the opinion letter appears to have been created for the pursuit of benefits rather than medical treatment. (Tr. 20).

The ALJ also noted that while Drs. Albano, Lieb, and Curylo indicate Williams had anxiety in her medical history and was treated with Xanax, there is no evidence of ongoing objective medical findings of severe anxiety. (Tr. 20.) The ALJ also determined that the medical treatment records do not document that Williams received any ongoing or frequent treatment through a psychiatrist, psychologist, or counselor. (Tr. 20-21). The ALJ found there is no medical evidence that any treating psychiatrist or psychologist found that Williams had any significant limitations of function lasting twelve months in duration since the alleged onset date of disability. (Tr. 21.) The ALJ also noted that Dr. Wang's opinion was inconsistent with Dr. Diemer, the state agency psychologist. (Tr. 21.) Based on the foregoing, the ALJ concluded that Dr. Wang's opinion was entitled to little weight. The Court finds that the ALJ has given good

reasons for according little weight to Dr. Wang's opinion and the ALJ's finding is supported by substantial evidence in the record. *See Hacker*, 459 F.3d at 937 (ALJ did not err in discounting treating physicians' opinions that were inconsistent with medical record and claimant's activities); *Shannon v. Chater*, 54 F.3d 484, 486 (8th Cir. 1995) (it appeared that claimant's doctor's visits were linked in quest to obtain benefits rather than seek medical treatment and failure to seek treatment previously inconsistent with finding of disability). Accordingly, the ALJ did not err in giving little weight to Dr. Wang's opinion.

### 2.      Non-Treating Physicians

Dr. Diemer completed a Physical RFC Assessment regarding Williams and Dr. Sutton completed a Psychiatric Review Technique regarding Williams. Dr. Diemer and Dr. Sutton are state agency doctors. Williams asserts that the ALJ did not identify the weight given to Dr. Diemer's medical opinion and erroneously gave nominal weight to Dr. Sutton's opinion.

### a.      Dr. Diemer

The ALJ mentions the Physical RFC Assessment completed by Dr. Diemer and notes that Dr. Diemer found Williams capable of a significant range of sedentary work. (Tr. 19, 293-298.) The ALJ then found that Dr. Diemer's findings do not significantly support Williams's allegations. (Tr. 19.) The ALJ does not provide any information as to the weight or use of Dr. Diemer's Assessment in determining Williams's RFC. Plaintiff asserts that because the ALJ and Dr. Diemer both stated that Williams was capable of sedentary work, it should be assumed that the ALJ based her decision on Dr. Diemer's opinion, which was improper.

"An ALJ may consider the opinion of an independent medical advisor as one factor in determining the nature and severity of a claimant's impairment." *Hacker*, 459 F.3d at 939. "The regulations specifically provide that the opinions of non-treating physicians may be considered.

20 C.F.R. 404.1527(e).[10]  Opinions of non-examining, consulting physicians standing alone, [however], are not considered substantial evidence.  *Harvey v. Barnhart*, 368 F.3d 1013, 1016 (8th Cir. 2004).  The ALJ in this case, however, did not rely solely on Dr. Diemer's opinion in determining Williams's RFC.  The ALJ's decision provides a very detailed analysis of the medical record as a whole, as well as the observations of Williams's treating physicians, and Williams's own description of her limitations.  Dr. Diemer's assessment also considered Williams's medical records.  Accordingly, the ALJ did not err in relying on Dr. Diemer's opinion as part of a review of all of the evidence in the record.  *Harvey*, 368 F.3d at 1016 (ALJ's reliance on consulting physician's opinion as part of the record provided substantial support for ALJ's findings); *Krogmeier v. Barnhart*, 294 F.3d 1019, 1024 (8th Cir. 2002) (ALJ's consideration of treating physician's opinion, consulting physician's opinion, claimant's testimony and credibility, and an independent review of medial record constituted substantial evidence in support of decision).  "While it may have been more preferable for the ALJ to discuss [Dr. Diemer's] opinion in more depth," "the ALJ was not required to perform an in-depth analysis on each piece of evidence." *Renstrom v. Astrue*, 680 F.3d 1057, 1065 (8th Cir. 2012).

## b.    Dr. Sutton

Williams asserts that Dr. Sutton's opinion should have been given more than nominal weight.  Dr. Sutton found Williams's anxiety was more than "not severe" and that she had moderate difficulties in maintaining concentration, persistence, and pace.  (Tr. 307.)  Dr. Sutton opined that Williams could perform simple repetitive tasks on a regular basis.  (Tr. 309.)  The ALJ gave little weight to Dr. Sutton's findings, because similar to Dr. Wang's opinion, it was inconsistent with the remainder of the record.  (Tr. 21.)  The Court finds that the ALJ's determination that Dr. Sutton's findings should be given little weight due to the inconsistency

---

[10] At the time of the ALJ's decision, this regulation was codified at 20 C.F.R. § 404.1527(f).

with the remainder of the medical record was proper for the same reasons as discussed above regarding Dr. Wang's opinion in Section V.A.1.b, above.

## B.      Determination of Anxiety as a Severe Impairment

Williams argues that the ALJ erred by failing to consider anxiety as a severe medically determinable impairment.   The Commissioner argues that the ALJ properly determined that Williams's anxiety was not a severe impairment.  The Court agrees.  To be considered severe, an impairment must *significantly* limit a claimant's ability to do basic work activities.  *See* 20 C.F.R § 404.1520(c) (emphasis added).  Step two [of the five-step] evaluation states that a claimant is not disabled if his impairments are not 'severe.'"  *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007).  "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities."  *Id.* at 707.  "If the impairment would have no more than a minimal effect on the claimant's ability to work, then it does not satisfy the requirement of step two."  *Id.* (citing *Page v. Astrue,* 484 F.3d at 1043).   "It is the claimant's burden to establish that his impairment or combination of impairments are severe.  *Id.* (citing *Mittlestedt v. Apfel,* 204 F.3d 847, 852 (8th Cir.2000)). "Severity is not an onerous requirement for the claimant to meet, . . . but it is also not a toothless standard."  *Id.* at 708.

The ALJ's determination that Williams's anxiety is non-severe is supported by substantial evidence in the record.   Williams claims to have suffered from severe anxiety throughout the relevant period, and she testified that anxiety caused her to have panic attacks (Tr. 39), crying spells two to three times a week (Tr. 39-40), irritable moods, (Tr. 39.) and memory loss.  (Tr. 40-41.)  Williams did not present with or seek treatment for anxiety, however, until November 2009, over a year after the onset date.  (Tr. 261.)  Previous treatment notes, though

they noted a history of anxiety and continued Xanax usage, did not reflect objective anxiety symptoms nor did they show Williams as ever having received formal psychiatric treatment for anxiety. (Tr. 222; Tr. 252.) "While not dispositive, a failure to seek treatment may indicate the relative seriousness of a medical problem" and "may be inconsistent with a finding of disability." *Shannon*, 54 F.3d at 487. Dr. Albano's November 2009 letter, while it recommended Williams be found disabled due to back pain and adverse reactions to her pain medication, did not communicate that Williams suffered from anxiety, severe or otherwise. (Tr. 265.) Moreover, while Dr. Albano diagnosed Williams with anxiety in June and December 2010, he did not note any objective anxiety symptoms or alter her treatment. (Tr. 331-332.) If there is no documentation in the record of psychological symptoms or ongoing psychological treatment, this weighs against Williams' contention that her anxiety is severe.

Williams did not seek treatment from a mental health specialist until she visited Dr. Wang in February 2011, over a year after her initial disability application. (Tr. 142-43, 338.) Dr. Wang, in an April 2011 letter, reported that Williams had major depression and panic disorder due to problems with short-term memory, focus, and concentration. (Tr. 342.) He concluded that she was totally disabled and unable to resume her prior employment or perform any work requiring mental alertness and concentration. (Tr. 342.) As the ALJ properly determined, Dr. Wang's treatment notes do not reflect overt psychological symptoms "indicative of such disabling limitations of function." (Tr. 20.) Dr. Wang's treatment notes reported that Williams felt frustrated, anxious, and depressed. (Tr. 337-339.) They also noted Williams was tearful and had "a lot of depression and anxiety." (Tr. 339.) Dr. Wang's treatment notes, however, do not reflect that Williams had issues with short-term memory, focus, or concentration. (Tr. 337-39.) Furthermore, the fact that previous mental health treatment was not

aggressively sought until February 2011 undermined the weight accorded to Dr. Wang's opinion. Therefore, the ALJ was correct in finding that the medical treatment records do not reflect severe symptoms and that Dr. Wang's letter was created for the pursuit of Williams's benefits rather than in the course of medical treatment. *See Shannon,* 54 F.3d at 486. Dr. Sutton found that "there [was] a reasonable probability of some limitations in concentration, persistence, and pace related to medication and/or pain, which is not clearly treated as a mental disorder but it [was] considered in the rating for concentration, persistence, and pace," but there was "no evidence of impaired intelligence or memory." Accordingly, the ALJ's determination that Williams's anxiety was not a severe impairment is supported by substantial evidence in the record.

**C.      Residual Functional Capacity and Ability to Perform Past Relevant Work**

Finally, Williams contends that the ALJ's RFC finding and determination that Williams is able to perform her past relevant work is not supported by substantial evidence. Williams notes that the ALJ's decision is internally inconsistent by finding that she is able to do sedentary work, but is also limited by a sit and stand option every hour. Williams also objects that the ALJ found that she could return to her past relevant work without any discussion of how the RFC related to the physical and mental demands of her former job as a loan originator and closer. The Commissioner acknowledges that the ALJ's decision is internally inconsistent, but asserts that the decision is still supported by substantial evidence.

RFC is defined as what the claimant can do despite his or her limitations, and includes an assessment of physical abilities and mental impairments.  20 C.F.R. § 404.1545.  The RFC is a function-by-function assessment of an individual's ability to do work related activities on a regular and continuing basis.[11]  SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996).   It is the ALJ's responsibility to determine the claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and the claimant's own descriptions of his limitations.  *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001).  Although the ALJ bears the primary responsibility for assessing a claimant's RFC based on all relevant evidence, a claimant's RFC is a medical question.  *Hutsell v. Massanari*, 259 F.3d 707, 711 (8th Cir. 2001) (citing *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001)).   Therefore, an ALJ is required to consider at least some supporting evidence from a medical professional.  *See Lauer*, 245 F.3d at 704 (some medical evidence must support the determination of the claimant's RFC).  An RFC determination made by an ALJ will be upheld if it is supported by substantial evidence in the record.  *See Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006).

The ALJ determined that Williams had the residual functional capacity to perform sedentary work as defined in 20 C.F.R. 1527(a) with the need for a sit-stand option every hour of the workday.  (Tr. 19.)

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. 1567(a).  The Social Security Administration has determined that

---

[11] A "regular and continuing basis" means 8 hours a day, for 5 days a week, or an equivalent work schedule.  SSR 96-8p, 1996 WL 374184, at *1.

> In some disability claims, the medical facts lead to an assessment of RFC which is compatible with the performance of either sedentary or light work except that the person must alternate periods of sitting and standing. The individual may be able to sit for a time, but must then get up and stand or walk for awhile before returning to sitting. Such an individual is not functionally capable of doing either prolonged sitting contemplated in the definition of sedentary work (and for the relatively few light jobs which are performed primarily in a seated position) or the prolonged standing or walking contemplated for most light work. . . . There are some jobs in the national economy—typically professional and managerial ones—in which a person can sit or stand with a degree of choice. If an individual had such a job and is still capable of performing it, or is capable of transferring work skills to such jobs, he or she would not be found disabled. However, most jobs have ongoing work processes which demand that a worker be in a certain place or posture for at least a certain length of time to accomplish a certain task.

SSR 83-12. In this case, the ALJ also received testimony from a VE. The ALJ asked the VE whether a person with Williams's age, education, and work experience who was capable of performing sedentary work performing only repetitive tasks with a need for a sit-stand option every fifteen minutes would be able to perform Williams's past work. The VE responded in the negative, because fifteen minute intervals of a sit-stand option would be impractical and Williams's work was complex not simple. The ALJ did not ask the VE information regarding whether a sit-stand option every hour would allow a return to Williams's past relevant work.

Next, the ALJ also determined that Williams could return to her past relevant work with the RFC of sedentary work with a sit-stand option every hour. SSR 86–62 states that "[t]he decision as to whether the claimant retains the functional capacity to perform past work which has current relevance has far-reaching implications and must be developed and explained fully in the disability decision." SSR 82–62, 1982 WL 31386 at *3. "Since this is an important and, in some instances, a controlling issue, every effort must be made to secure evidence that resolves the issue as clearly and explicitly as circumstances permit." *Id.* SSR 82–62 goes on to explain:

In finding that an individual has the capacity to perform a past relevant job, the determination or decision must contain among the findings the following specific findings of fact:

> 1.  A finding of fact as to the individual's RFC.
>
> 2.  A finding of fact as to the physical and mental demands of the past job/occupation.
>
> 3.  A finding of fact that the individual's RFC would permit a return to his or her past job or occupation.

*Id.* at *4.

The Eighth Circuit has consistently held that SSR 82–62 requires an ALJ to "fully investigate and make *explicit* findings as to the physical and mental demands of a claimant's past relevant work and to compare that with what the claimant herself is capable of doing before [the ALJ] determines that [the claimant] is able to perform her past relevant work." *Groeper v. Sullivan,* 932 F.2d 1234, 1238 (8th Cir.1991) (emphasis added in original) (quoting *Nimick v. Sec. of Health and Human Servs.,* 887 F.2d 864, 866 (8th Cir.1989)); *see also Kirby v. Sullivan,* 923 F.2d 1323, 1326 (8th Cir.1991). The *Groeper* court cautioned that an ALJ's failure to fulfill this obligation *requires* reversal. *Groeper,* 932 F.2d at 1238 (emphasis added) (citing *Kirby,* 923 F.2d at 1327); *but see Battles v. Sullivan,* 902 F.2d 657, 658–59 (8th Cir.1990) (Failure to make explicit findings regarding a claimant's past relevant work was not reversible error where the claimant failed to produce any medical evidence that established a disability before the expiration of her insured status).

An ALJ's decision that a claimant can return to his past work must be based on more than conclusory statements. The ALJ must specifically set forth the claimant's limitations, both physical and mental, and determine how those limitations affect the claimant's residual functional capacity. The ALJ must also make explicit findings regarding the actual physical and

mental demands of the claimant's past work. Then, the ALJ should compare the claimant's residual functional capacity with the actual demands of the past work to determine whether the claimant is capable of performing the relevant tasks. *See Kirby v. Sullivan,* 923 F.2d at 1326–27 (8th Cir.1991). A conclusory determination that the claimant can perform past work, without these findings, does not constitute substantial evidence that the claimant is able to return to his past work. *Id.* at 1327.

The ALJ stated that her decision was based on Williams's Work History Report where Williams indicated that in an eight hour workday, she spent two hours walking, three hours standing, and three hours sitting. (Tr. 22, 184). Williams also reported that she lifted less than ten pounds and that she wrote, typed, and handled small objects. (Tr. 22, 184.) The Court finds that this was not substantial evidence to determine that Plaintiff could return to her past relevant work as a loan originator with a sit-stand option every hour. The ALJ's analysis was conclusory and failed to include the details necessary to determine the physical and mental demands of Williams's past relevant work. Therefore, this case will be reversed and remanded for consideration consistent with this opinion.

Upon remand, the ALJ may refer to the job descriptions in the *Dictionary of Occupational Titles,* for a definition of Williams's job as it is performed in the national economy. *Sells v. Shalala*, 48 F.3d 1044, 1047 (8th Cir. 1995). The Eighth Circuit has upheld an ALJ's decision that a claimant could perform her past relevant work based on the claimant's description of her past duties. *See Zeiler v. Barnhart,* 384 F.3d 932, 936 (8th Cir.2004) (where ALJ relied upon claimant's own description of her past duties in finding that claimant never had to lift more than ten pounds and stood much of the day, substantial evidence supported the ALJ's characterization of her past work as requiring light exertion). In this case, the description given

by Williams's work history report did not provide sufficient detail of Williams's job duties or whether a sit-stand option would be practical.

## VI.    CONCLUSION

Based on the foregoing, the undersigned finds that the ALJ's RFC finding and determination that Williams can return to her past relevant work is not supported by substantial evidence and this case should be reversed and remanded.

Accordingly,

**IT IS HEREBY ORDERED** that the relief which Williams seeks in her Complaint and Brief in Support of Complaint is **GRANTED**.  [Docs. 1, 7].

**IT IS FURTHER ORDERED** the ALJ's decision of April 29, 2011 is **REVERSED** and **REMANDED**.

**IT IS FURTHER ORDERED** that a Judgment of Reversal and Remand will be filed contemporaneously with this Memorandum and Order remanding this case to the Commissioner of Social Security for further consideration pursuant to 42 U.S.C. § 405(g), sentence 4.

Dated this <u>29th</u> day of November, 2012.

    <u>    /s/ Nannette A. Baker                    </u>
NANNETTE A. BAKER
UNITED STATES MAGISTRATE JUDGE